## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 06 2019, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the: D.B., K.B., K.C., and M.C. (Minor Child) Children in Need of Services, | December 6, 2019 |
| and | Court of Appeals Case No. 19A-JC-1510 |
| S.O. (Mother), | Appeal from the Decatur Circuit Court |
| *Appellant-Respondent,* | The Honorable Timothy Day, Judge |
| v. | Trial Court Cause No. 16C01-1812-JC-453 16C01-1812-JC-454 16C01-1812-JC-455 16C01-1812-JC-456 |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | |

**Tavitas, Judge.**

## Case Summary

[1] S.O. ("Mother") appeals the trial court's order adjudicating Mother's four minor children, D.B., K.B., K.C., and M.C. (collectively, the "Children") as children in need of services ("CHINS"). We affirm.

## Issue

[2] Mother raises one issue, which we restate as whether the evidence is sufficient to adjudicate the Children as CHINS.

## Facts

[3] Mother is the parent of D.B., who was born in January 2009; K.B., who was born in September 2011; K.C., who was born in June 2014; and M.C., who was born in October 2017. M.C. ("Father") is the father of K.C. and M.C., and Da.B. is the father of D.B. and K.B.[1]

[4] On October 29, 2018, Mother was driving with infant M.C. in the vehicle when Mother reached down to pick up a baby bottle off the vehicle's floor. Mother drove off the side of the road and hit a tree. M.C. was uninjured in the crash, but Mother sustained lacerations to her face, three fractures to her neck, and four fractures to her right hip. Mother's drug screen at the hospital was positive for methamphetamine, amphetamines, and cannabinoids. Mother admitted to

---

[1] Although the order on the CHINS fact-finding hearing identifies Da.B. as the father of K.B., some of the records presented to us identify Father as the father of K.B, and some of the records do not identify the father of K.B.

smoking marijuana and claimed that a friend must have laced the marijuana with methamphetamine without her knowledge. After the accident, Mother was prescribed hydrocodone as a result of her injuries. Mother was not charged criminally after the accident.

[5] On November 28, 2018, Mother entered into an informal adjustment with the Decatur County Department of Child Services ("DCS") to address her parenting skills and drug usage. Mother agreed to participate in random drug screens, a parenting assessment, and a substance abuse assessment. At that time, the family was living with a grandmother while Father worked twelve-hour shifts, five or six days a week.

[6] The family then moved into their own apartment ten miles away from the grandmother, leaving Mother alone with the Children for long periods of time. Concerns over the move and lack of supervision prompted DCS to file a petition on December 28, 2018, alleging that the Children were CHINS. DCS alleged:

> A. [Mother] was admitted to Methodist Hospital on 10/29/2018 after a motor vehicle accident. [M.C.] was in the vehicle at the time of the accident; however, [M.C.] was not injured.

> B. [Mother's] urine drug screen at the hospital was positive for methamphetamine, amphetamines and cannabinoids.

> C. She admitted to using marijuana the weekend prior; however, reported the methamphetamine must have been in the "joint" she smoked, as she denied methamphetamine use.

D.   [Da.B.], father of [D.B.], appears unable or unwilling to protect the children without court intervention.

E.   [Father], father of [K.B.]; father of [M.C.]; father of [K.C.] appears unable or unwilling to protect the children without court intervention.

Appellant's App. Vol. II pp. 27-28.

[7]   Mother's compliance with random drug screens through a service provider was inconsistent.  In March 2019, Mother started participating in the drug screens at the DCS office.  In February 2019, Mother tested positive for methamphetamine and buprenorphine.  In March 2019, Mother tested positive for unprescribed oxycodone.  Mother continued testing positive for hydrocodone, which she was prescribed.  Mother did not start therapy with Centerstone until March 2019.  At the time of the fact-finding hearing, Mother had only attended three treatment sessions.

[8]   The family case manager attempted to obtain a drug screen from Mother the week before the fact-finding hearing, and Mother "begged [him] not to come back, and said she would go to Greensburg on Friday to test."  Tr. Vol. I p. 49. Although he usually receives drug test results back within two days, the family case manager did not receive any results from the test Mother was supposed to obtain.  When asked at the hearing how long she had "been clean," Mother responded: "I would say at least a month.  I have mess ups but that was like maybe six - - six weeks ago."  *Id.* at 24.

[9]     A fact-finding hearing was held on April 18, 2019. At the end of the fact-finding hearing, the trial court stated:

> You have this severe accident. You're hurt severely. And you're told by some hospital staff, ultimately DCS, how you tested positive for meth. You would think that that traumatic event would be enough. If you're inclined to get over a drug - a substance abuse issue that should do it, but after that traumatic event, you tested positive for meth again.
>
> You've tested positive for Suboxone that I have not heard you have a prescription for.
>
> You've tested positive for Oxycodone which I don't know whether the hydrocodone can give you a false positive for that or not, but I haven't heard you have a prescription for Oxycodone.
>
> I'm not holding against you in any way the hydrocodone. You have a prescription for that.
>
> But without DCS's intervention, you weren't in drug treatment before they intervened. You weren't at Centerstone. You weren't seeing anyone to try to address a potential problem. And even after they got involved, in other words, you knew you were going to get drug screened. You knew that your kids were at issue, that someone was watching you. You still tested positive in February for meth. That's concerning just simply because, you know, people that don't have a problem can't overcome it when they know, okay, I need to do something here.
>
> People that do have a problem in the face of all this adversity, the bad wreck you had, the injuries you had, DCS - obviously, DCS means, I can lose my kids, staring you in the face, you still found

your way to test positive for these drugs that you don't have a prescription for.

So I feel like you do need services and I feel like without the course of intervention of the Court, you won't. And I feel like you're getting the things - I mean, you're doing exactly what you need to do right now. I just don't have any guarantee you'll continue to do them, because these were initiated by DCS.

\* \* \* \* \*

I can't sit here and tell you that the meth caused your accident. All I'm saying is that should have been your wakeup call right there, and it apparently hasn't been because you're continuing to test positive for illegal substances. And again, you've got –I – kind of my theory is that the hydrocodone somewhat substitutes for meth, and maybe that's why you're a bit able to not do the meth for short periods of time, but you do have a drug that you have a prescription for.

When that runs out, who knows what's going to happen. And I want – I feel like the DCS needs to be involved when that prescription expires to make sure that you're not going to substitute something else.

So for that reason, I'm going to find that the children are CHINS. I'll adjudicate them as such.

Tr. Vol. I pp. 61-63.

[10] The trial court then entered findings of fact and conclusions of law that the Children were CHINS. The trial court found:

1. That [Mother's] continued drug use is affecting the children.

2. [Da.B.], father of [D.B. and K.B.], is unable [to] protect the children without court intervention.

3. [Father] of [M.C. and K.C.] is unable to protect the children without court intervention.

Appellant's App. Vol. II p. 67. After a dispositional hearing, the trial court entered a dispositional order. Mother now appeals.

## Analysis

[11] Mother argues that the evidence is insufficient to conclude that the Children are CHINS. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Here, the trial court entered findings of fact and conclusions of law in granting DCS's CHINS petition. When reviewing findings of fact and conclusions of law, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[12]    There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. *K.D.*, 962 N.E.2d at 1253. DCS must prove: (1) the child is under the age of eighteen; (2) that one of eleven different statutory circumstances exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court. *Id.*

[13]    In this case, DCS alleged the children were CHINS under the general category of neglect as defined in Indiana Code Section 31-34-1-1. The statute provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> > (A) when the parent, guardian, or custodian is financially able to do so; or
> >
> > (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[14] "[T]he purpose of a CHINS adjudication is to protect children, not [to] punish parents." *N.E.*, 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but rather is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id.* at 105. "A CHINS adjudication focuses on the condition of the child . . . . [T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id*. (citations omitted).

## *A. Endangerment of the Children*

[15] The first section of Indiana Code Section 31-34-1-1(1) provides that DCS must prove:

> the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; . . . .

[16] Mother argues that DCS failed to demonstrate any child endangerment in this case. According to Mother, there is no evidence that her motor vehicle accident was caused by her drug usage. Mother contends that there is no evidence that she has "a drug habit let alone that an addiction impacted her children." Appellant's Br. p. 13.

[17]  DCS presented evidence that, in October 2018, Mother was involved in a motor vehicle accident with infant M.C. in the vehicle. Mother reached for a baby bottle on the floor of the vehicle, ran off the road, hit a tree, and was severely injured. At the time, Mother tested positive for methamphetamine, amphetamines, and cannabinoids. Despite services provided by DCS under an informal adjustment, Mother tested positive for methamphetamine and buprenorphine in February 2019 and for oxycodone in March 2019.[2] Mother's participation in random drug screening was inconsistent. Even a week before the fact-finding hearing, Mother begged the family case manager not to return to her house to perform a drug screen.

[18]  It is clear that Mother's conduct put M.C. at significant risk, and Mother continues to test positive for illegal substances, which further places the Children at risk. Mother's argument is merely a request that we reweigh the evidence, which we cannot do. DCS presented sufficient evidence to demonstrate that the Children's physical or mental condition is seriously endangered. The trial court's finding is not clearly erroneous. *See, e.g., In re J.L.*, 919 N.E.2d 561, 564 (Ind. Ct. App. 2009) (affirming a trial court's CHINS finding where the mother used illegal substances while the child was sleeping).

---

[2] Mother claims in her Appellant's Brief that, "[b]etween the October accident and the May fact-finding hearing, Mother had one positive drug screen for a non-prescribed substance." Appellant's Br. p. 6. DCS, however, presented evidence that Mother tested positive for methamphetamine and buprenorphine in February 2019 and for oxycodone in March 2019.

## B. Coercive Intervention

The second section of Indiana Code Section 31-34-1-1(2) states that DCS must prove:

> the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
>
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

This element "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the *ability* to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs.'" *In re D.J. v. Indiana Dept. of Child Services,* 68 N.E.3d 574, 580 (Ind. 2017) (quoting *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014)) (emphasis supplied). When considering this requirement, "courts should consider the family's condition not just when the case was filed, but also when it is heard." *D.J.,* 68 N.E.3d at 580 (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

According to Mother, DCS failed to prove that the children's needs are unmet. Mother argues that, "[a]t no time between October 2018 and May 2019 . . . did anyone ever notice Mother neglecting the children's needs." Appellant's Br. p. 14. Mother further argues that coercive interference is unnecessary because the CHINS petition was only filed because the family moved out of the

grandmother's residence. Mother contends that the trial court's decision was based on suppositions that she might turn into a drug addict.

[21] The family moved out of the grandmother's residence during the informal adjustment, which left Mother unsupervised with the Children for long periods of time while Father worked. DCS was appropriately concerned with the situation based on Mother's repeated positive drug test results. Despite a serious accident that severely injured Mother and seriously endangered M.C., Mother has continued to test positive for illegal or unprescribed substances, including methamphetamine, buprenorphine, and oxycodone. The trial court's decision was not based merely on suppositions that Mother would turn to illegal substances after her prescription for hydrocodone expired.

[22] DCS also presented evidence that, despite her positive drug tests in October 2018 after the accident and in February 2019, Mother did not begin addiction services until March 2019, after the CHINS proceedings were initiated. At the time of the fact-finding hearing, Mother had attended only three counseling sessions. The trial court believed that, without court intervention, Mother would not continue with the services. Mother's argument to the contrary is merely a request that we reweigh the evidence, which we cannot do.

[23] DCS presented sufficient evidence that the Children need care, treatment, or rehabilitation that they are not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court. The trial court's finding is not clearly erroneous.

## Conclusion

[24]   The evidence is sufficient to prove that the Children are CHINS.   We affirm.

Brown, J., and Altice, J., concur.